**TA Legal Group PLLC**
Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 E Main Street, Suite 3-4
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com
*Attorneys for Plaintiff, FLSA Collective Plaintiffs and Class Members*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARY M. O'HARA, *on behalf of herself, FLSA Collective Plaintiffs, and Class Members,*<br><br>Plaintiff,<br><br>- against -<br><br>MOUNT SINAI HEALTH SYSTEM, INC., MOUNT SINAI DOCTORS OF LONG ISLAND, ALBERT ALVAREZ, RAYMOND FOWLER and JOSEPHINE BROOKS<br><br>Defendants. | **Case No.:**<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, MARY M. O'HARA ("Plaintiff or "O'Hara"), by and through her undersigned counsel of record, TA Legal Group PLLC, hereby files this Class and Collective Action Complaint ("Complaint") against Defendants MOUNT SINAI HEALTH SYSTEM, INC. ("Mount Sinai Health"), MOUNT SINAI DOCTORS OF LONG ISLAND ("Mount Sinai

Doctors"), ALBERT ALVAREZ ("Alvarez'), RAYMOND FOWLER ("Fowler"), and JOSEPHINE BROOKS ("Brooks"), (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1. Plaintiff Mary M. O'Hara ("Plaintiff" or "O'Hara"), a dedicated Registered Nurse with twenty-six years of experience, brings this action against her former employer, Defendants, to redress a systemic deprivation of earned wages, unlawful discrimination, and a vicious campaign of retaliation that culminated in her wrongful termination.

2. During her nearly eight-year tenure, Defendants fostered an exploitative work environment. Plaintiff, along with a collective of similarly situated hourly employees, was routinely expected and required to perform off-the-clock work, including working through unpaid meal breaks and staying well past scheduled shifts to ensure continuity of patient care. Defendants knowingly accepted the benefits of this labor while deliberately and systematically denying these employees their lawfully earned overtime compensation.

3. Beyond the pervasive wage theft, Defendants cultivated a discriminatory "boys club" culture heavily skewed toward favored male employees recruited by management from a prior hospital. While these male colleagues were permitted to blatantly violate hospital policies, alter their schedules to accommodate chronic lateness, and leave shifts hours early to work second jobs, female employees like Plaintiff were subjected to disparate treatment and marginalization.

4. This disparity was particularly evident in Defendants' hostility toward Plaintiff's legally protected rights. When Plaintiff was granted intermittent family leave to care for her ailing mother and special needs child, Defendants routinely hindered her use of the leave,

refused to provide administrative guidance, and weaponized her caretaking responsibilities against her.

5. Defendants' unlawful conduct reached a breaking point in early 2026. When Mount Sinai attempted to enforce a sudden and unlawful policy forcing staff to forfeit their accrued Paid Time Off during a mandated snowstorm closure, Plaintiff engaged in protected activity by making a formal complaint about the violation and reporting it to the corporate compliance hotline.

6. In immediate and direct retaliation for her protected complaints, Defendants launched a targeted campaign of hyper-surveillance and harassment against Plaintiff. Desperate for a pretext, Defendants retroactively scrutinized security footage to manufacture a disciplinary infraction, terminating Plaintiff's employment exactly three weeks after her call to the compliance hotline.

7. By this action, Plaintiff seeks to recover unpaid overtime wages, liquidated damages, and statutory penalties on behalf of herself and similarly situated collective and class members under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL")

8. Plaintiff further asserts individual claims against Defendants for FMLA interference, discrimination, and unlawful retaliation under the FLSA, NYLL, and state civil rights laws.

## CLAIMS

9. Plaintiff seeks recovery under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., on behalf of herself and a collective of similarly situated employees, that Defendants failed to pay lawfully earned overtime compensation and is therefore entitled to unpaid overtime wages, liquidated damages, and reasonable attorneys' fees and costs.

10. Plaintiff alleges, pursuant to the NYLL §§ 190 et seq. and 650 et seq., and Federal Rule of Civil Procedure 23, that Defendants failed to pay Plaintiff and Class Members all wages and overtime compensation owed under New York law and failed to provide accurate wage notices and wage statements, and seeks unpaid regular and overtime wages, liquidated damages, statutory penalties and reasonable attorneys' fees and costs.

11. Plaintiff further alleges, pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., that Defendants interfered with her protected intermittent family leave and retaliated against her for exercising her statutory rights, and is therefore entitled to lost wages, liquidated damages, equitable relief, and reasonable attorneys' fees and costs.

12. Plaintiff further alleges, pursuant to the anti-retaliation provisions of the New York Labor Law, NYLL § 215, that Defendants retaliated against her for reporting and opposing conduct she reasonably believed constituted labor law violations regarding the mandatory forfeiture of paid time off, and is therefore entitled to reinstatement, back pay, front pay, liquidated damages, and reasonable attorneys' fees and costs.

13. Plaintiff further alleges, pursuant to the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, that Defendants, including individual defendants acting as aiders and abettors, subjected her to family responsibilities and gender discrimination, a hostile work environment, and retaliation, and is therefore entitled to an award of compensatory damages, emotional distress damages, punitive damages, and reasonable attorneys' fees and costs.

14. Plaintiff further alleges, pursuant to the Employee Retirement Income Security Act ("ERISA") and the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161 et seq., that corporate Defendants failed to provide the legally required notice of her right to elect continuation of health insurance coverage following a qualifying event, and is

therefore entitled to statutory penalties of up to $110 per day, and reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1337 because Plaintiff's claims under the Fair Labor Standards Act and the Family and Medical Leave Act raise a federal question.

16. This Court possesses supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in this District.

18. At all relevant times, Defendants were engaged in an enterprise whose annual volume of sales made or business done was not less than $500,000, and Defendants' healthcare operations affected interstate commerce because employees handled medical goods, materials, supplies, records, equipment, and other instrumentalities that moved in interstate commerce.

## PARTIES

### Plaintiff

19. **Plaintiff Mary M. O'Hara** is an adult individual residing in Suffolk County, New York. At all times relevant to this Complaint, Plaintiff was an "employee" of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(e), the NYLL, the FMLA, and the NYSHRL.

### Defendants

20. **Defendant Mount Sinai Health** and **Mount Sinai Doctors** (collectively "Corporate Defendants") are domestic corporate entities, healthcare systems, and/or

organizations that operate medical facilities within the State of New York, including the following Long Island locations (collectively, the "Facilities")

a. Mount Sinai Doctors – Greenlawn, 5 Cuba Hill Road, Greenlawn, NY 11740;

b. Colon & Rectal Surgical Specialists of New York – Greenlawn, 5 Cuba Hill Road, Greenlawn, NY 11740;

c. Mount Sinai Doctors – Huntington (Maternal Fetal Medicine), 325 Park Avenue, Huntington, NY 11743;

d. Mount Sinai Doctors – Bellmore, 2750 Merrick Road, Bellmore, NY 11710;

e. Mount Sinai Doctors – Carle Place, 393–401 Old Country Road, 2nd & 3rd Floor, Carle Place, NY 11514;

f. Mount Sinai Doctors – Hewlett (Cardiovascular Surgery), 1420 Broadway, 2nd Floor, Hewlett, NY 11557;

g. Mount Sinai Doctors – Five Towns (Hewlett), 1436 Broadway, Hewlett, NY 11557;

h. Mount Sinai Doctors – Long Beach, 440 East Bay Drive, Long Beach, NY 11561;

i. Mount Sinai Doctors – Lynbrook (Family Medicine), 185 Merrick Road, Suite 1B, Lynbrook, NY 11563;

j. Mount Sinai Doctors – Manhasset, 1155 Northern Boulevard, Manhasset, NY 11030;

k. Mount Sinai Doctors – Oceanside (Family Medicine), 196 Merrick Road, Oceanside, NY 11572;

l. Mount Sinai Doctors – Rockville Centre (Hematology/Oncology & Neurology), 242 Merrick Road, Suites 301 & 302, Rockville Centre, NY 11570;

m. Mount Sinai Doctors – Rockville Centre (Urology/Urogynecology), 2 Lincoln Avenue, Suite 102, Rockville Centre, NY 11570;

n. Mount Sinai Doctors – Valley Stream, 1 South Central Avenue, Valley Stream, NY 11580;

o. Mount Sinai – Wantagh, 2020 Wantagh Avenue, Wantagh, NY 11793;

p. Mount Sinai South Nassau – Oceanside, 440 Merrick Avenue, Oceanside, NY 11572; and

q. Mount Sinai South Nassau – Hempstead, 250 Fulton Avenue, Hempstead, NY 11550.

21. At all relevant times, the Facilities operated as part of a commonly owned, commonly managed, and centrally controlled Mount Sinai healthcare enterprise.

22. The Facilities shared a common business purpose: providing healthcare, medical, diagnostic, specialty, administrative, and patient-support services under the Mount Sinai umbrella to patients in Nassau County and Suffolk County.

23. Defendants exercised centralized control over labor relations, human resources, payroll administration, timekeeping systems, employee scheduling practices, wage-payment practices, leave administration, disciplinary procedures, compliance protocols, and employee benefits for hourly, non-exempt employees working at the Facilities.

24. Defendants maintained and applied common wage-and-hour policies and practices across the Facilities, including policies and practices governing meal breaks, rest breaks, clock-in and clock-out procedures, overtime approval, post-shift work, timekeeping edits, payroll processing, wage notices, and wage statements.

25. Plaintiff alleges that the FLSA and NYLL violations asserted in this action were not isolated to Plaintiff or to one facility, but arose from common policies, practices, procedures, protocols, routines, and rules applicable to hourly, non-exempt employees across the Facilities.

26. Plaintiff, FLSA Collective Plaintiffs, and Class Members were subject to the same or substantially similar operational expectations requiring them to complete patient-care, administrative, clerical, technical, and support work regardless of whether such work occurred during unpaid meal periods, after scheduled shifts, or outside recorded compensable time.

27. Defendants knew or should have known that hourly, non-exempt employees at the Facilities were required or permitted to perform compensable work through unpaid breaks and beyond scheduled shifts because Defendants' managers, supervisors, and human resources personnel observed, directed, approved, relied upon, and benefited from that work.

28. Defendants' centralized payroll and timekeeping practices failed to ensure that Plaintiff, FLSA Collective Plaintiffs, and Class Members were paid for all compensable hours worked, including overtime hours worked in excess of forty hours per workweek.

29. Defendants also maintained centralized wage notice and wage statement practices applicable to hourly, non-exempt employees across the Facilities, resulting in common NYLL violations regarding the failure to provide accurate wage notices and wage statements reflecting all hours worked, overtime rates, and wages owed.

30. The Facilities shared common management and supervisory structures, including managers and administrators who implemented and enforced Mount Sinai policies concerning staffing, scheduling, attendance, timekeeping, leave, discipline, and payroll.

31. Employees were interchangeable across the Facilities. Defendants could assign, transfer, float, train, or otherwise utilize hourly employees across multiple facilities depending on staffing needs, departmental demands, and operational requirements.

32. Plaintiff herself performed work connected to multiple Mount Sinai Facilities, including traveling to off-site locations to train new nursing staff, demonstrating the integrated and interchangeable nature of Defendants' staffing model.

33. Defendants' common enterprise operated under shared branding, shared administrative control, shared human resources functions, shared compliance expectations, shared payroll practices, and shared employment policies.

34. The covered locations therefore functioned as an integrated enterprise for purposes of Plaintiff's FLSA and NYLL wage claims.

35. Because Defendants operated the Facilities as an integrated enterprise, Defendants are jointly responsible for the wage-and-hour policies and practices that deprived Plaintiff, FLSA Collective Plaintiffs, and Class Members of wages and overtime compensation owed under federal and New York law.

36. At all relevant times, Corporate Defendants were an "employer" of Plaintiff and the FLSA Collective Plaintiffs within the meaning of the FLSA, NYLL, FMLA, and NYSHRL, and functioned as the "plan administrator" for the purposes of ERISA and COBRA.

37. **Defendant Albert Alvarez** is an individual who, at all relevant times, served as the Director of Radiology for Corporate Defendants. Alvarez exercised substantial operational control over the terms and conditions of Plaintiff's employment. He possessed and exercised the authority to dictate work schedules, authorize off-the-clock work, deny meal breaks, and directly participate in the decision to terminate Plaintiff's employment. As such, Alvarez qualifies as an "employer" subject to individual liability under the FLSA, NYLL, and FMLA, and as an "aider and abettor" under the NYSHRL.

38. **Defendant Raymond Fowler** is an individual who, at all relevant times, served as the Radiology Manager for Corporate Defendants. Fowler actively supervised Plaintiff,

possessed the authority to monitor and maintain employment records, directed daily workflow, and directly participated in the disparate disciplinary scrutiny and retaliatory actions leading to her termination. As such, Fowler qualifies as an "employer" subject to individual liability under the FLSA, NYLL, and FMLA, and as an "aider and abettor" under the NYSHRL.

39. **Defendant Josephine Brooks** is an individual who, at all relevant times, served as the Human Resources Manager for Corporate Defendants. Brooks exercised direct administrative control over Plaintiff's statutory rights, including the administration (or lack thereof) of Plaintiff's FMLA leave, the processing of medical documentation, the issuance of COBRA notices, and directly participated in the investigatory and termination meetings resulting in Plaintiff's discharge. As such, Brooks qualifies as an "employer" subject to individual liability under the FMLA, and as an "aider and abettor" under the NYSHRL.

## CONDITIONS PRECEDENT TO SUIT

40. This Court has personal jurisdiction over the Defendants in that they are incorporated in the state of New York, maintain corporate headquarters and numerous medical facilities in the State of New York, are domiciled in the state of New York, and/or are subject to personal jurisdiction under NY CPLR § 302, New York's long arm statute.

41. Defendants engage in an enterprise whose annual volume of sales made or business done is not less than $500,000. As a major healthcare system, the activities of Defendants affect interstate commerce in that employees of Defendants regularly handle medical goods, materials, and equipment produced outside of New York that moved in interstate commerce, and the Defendants, as employers of such a business, are subject to the jurisdiction of the FLSA.

42. At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA, the NYLL, the FMLA, the NYSHRL, and any other Regulations thereunder.

43. At all relevant times, the healthcare and administrative work performed by Plaintiff and FLSA Collective Plaintiffs was directly essential to the business operated by Defendants.

44. Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## FLSA COLLECTIVE ACTION ALLEGATIONS

45. Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all nurses and breast care coordinators compensated on an hourly basis employed by Mount Sinai Health and Mount Sinai Doctors at the Facilities on or after the date that is three (3) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

46. At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, and routines utilizing an off-the-clock work scheme—specifically requiring employees to routinely work through unpaid meal breaks and remain past their scheduled shifts, in order to defraud employees of proper overtime compensation as required by law. The grievances articulated by Plaintiff herein mirror those affecting all FLSA Collective Plaintiffs.

47. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related

to this action, their names and addresses are readily available from Defendants' employment and payroll records. Notice can be provided to the FLSA Collective Plaintiffs via first-class mail to the last address known to Defendants.

## RULE 23 CLASS ACTION ALLEGATIONS

48. Plaintiff brings the NYLL claims asserted herein as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all non-managerial nurses and breast care coordinators compensated on an hourly basis employed by Defendants at the Facilities in Nassau County and Suffolk County, New York, from the date six (6) years prior to the filing of this Complaint through the present, who were not paid all wages and overtime compensation owed under the NYLL and/or were not provided accurate wage notices and wage statements required by the NYLL ("Class" or "Class Members").

49. Throughout the relevant period, Plaintiff and Class Members were similarly situated, shared substantially similar pay provisions, were compensated on an hourly basis, and were subject to Defendants' uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules concerning timekeeping, scheduling, meal breaks, post-shift work, payroll processing, wage notices, and wage statements.

50. Plaintiff alleges that Defendants' common policies and practices resulted in widespread failures to pay Plaintiff and Class Members all wages owed under the NYLL, including overtime compensation for hours worked in excess of forty (40) hours in a workweek.

51. Plaintiff further alleges that Defendants failed to provide Plaintiff and Class Members with accurate wage notices and wage statements in compliance with NYLL § 195.

52. Class Members are readily ascertainable. The number and identity of Class Members are determinable from Defendants' employment, scheduling, timekeeping, payroll, human resources, and wage-statement records, including records reflecting the locations where

Class Members worked, the positions they held, their rates of pay, the hours recorded, and the wages paid.

53. For purposes of notice and all other purposes related to this action, the names, last known addresses, telephone numbers, email addresses, dates of employment, job titles, work locations, pay rates, and payroll records of Class Members are readily available from Defendants' records.

54. The proposed Class is so numerous that joinder of all members is impracticable, and disposition of their claims as a class will benefit the parties and the Court.

55. Although the precise number of Class Members is presently unknown and within Defendants' possession and control, Plaintiff alleges that Defendants employed numerous hourly, non-exempt employees across the covered Nassau County and Suffolk County locations during the relevant period.

56. Defendants' common wage-and-hour policies and practices affected Plaintiff and Class Members in the same or substantially similar manner, and Defendants benefited from the same type of alleged wrongful conduct as to Plaintiff and each Class Member.

57. Plaintiff and Class Members sustained similar losses, injuries, and damages arising from Defendants' alleged common policies, practices, and procedures, including unpaid wages, unpaid overtime compensation, and statutory wage notice and wage statement violations.

58. There are questions of law and fact common to the Class that predominate over any individualized questions, including:

a. whether Defendants maintained common policies requiring or permitting hourly, non-exempt employees to work through unpaid meal breaks;

b. whether Defendants maintained common policies requiring or permitting hourly, non-exempt employees to work before or after scheduled shifts without compensation;

c. whether Defendants knew or should have known that Plaintiff and Class Members performed compensable off-the-clock work;

d. whether Defendants failed to pay Plaintiff and Class Members all overtime wages owed under the NYLL;

e. whether Defendants' timekeeping and payroll practices accurately captured all hours worked by Plaintiff and Class Members;

f. whether Defendants failed to provide compliant wage notices under NYLL § 195(1); and

g. whether Defendants failed to provide compliant wage statements under NYLL § 195(3).

59. Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class Members were hourly, non-exempt employees allegedly subjected to the same or substantially similar wage-and-hour policies and practices that resulted in unpaid wages, unpaid overtime, and inaccurate wage notices and wage statements.

60. Plaintiff's claims arise from the same course of conduct as the claims of Class Members, namely Defendants' alleged uniform failure to compensate hourly, non-exempt employees for all compensable work performed and Defendants' alleged failure to provide legally compliant wage notices and wage statements.

61. Plaintiff will fairly and adequately protect the interests of the Class because her interests are aligned with those of Class Members and she seeks to recover unpaid wages,

overtime compensation, statutory damages, and other relief based on the same challenged policies and practices.

62. Plaintiff has no interests antagonistic to the interests of the Class.

63. Plaintiff is represented by attorneys experienced in employment litigation, wage-and-hour litigation, and class and collective action litigation.

64. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, particularly in the wage-and-hour context, where individual employees may lack the financial resources or practical ability to vigorously prosecute separate lawsuits against a large healthcare employer.

65. Class treatment will permit a large number of similarly situated hourly employees to prosecute common NYLL claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that would result from numerous individual actions.

66. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, would burden the Court and the parties with duplicative proceedings, and could establish incompatible standards of conduct for Defendants.

67. The common issues in this action can be decided through common proof, including Defendants' policies, payroll records, timekeeping records, scheduling records, wage notices, wage statements, organizational records, and testimony concerning centralized employment practices.

68. Any individualized damages calculations do not defeat class treatment because liability will turn principally on Defendants' alleged common wage-and-hour policies, practices, and records.

69. Certification of the NYLL Class is appropriate because Plaintiff alleges that Defendants subjected Plaintiff and Class Members to common wage-and-hour policies and practices that are capable of classwide proof and resolution.

## STATEMENT OF FACTS

### Plaintiff's Exemplary Employment History

70. Plaintiff is a Registered Nurse with 26 years of experience in the nursing profession.

71. Plaintiff began her employment with Defendants Mount Sinai Health System and Mount Sinai Doctors Long Island on or about August 22, 2018.

72. Plaintiff originally started as a part-time employee in the Radiology Department at the Greenlawn, New York office. As the office grew busier, Plaintiff transitioned to a full-time schedule at the Defendants' request.

73. Throughout her nearly eight-year tenure, Plaintiff was a dedicated and highly skilled nurse who consistently performed her duties to the highest standards, receiving positive evaluations noting she was "caring and compassionate" and an "asset to the Mount Sinai Group". She frequently went out of her way to support the department, including traveling to off-site locations such as Staten Island and Wantagh to train new nursing staff.

### Wage and Hour Violations: Systemic Unpaid Overtime for Plaintiff, FLSA Collective Plaintiffs, and Class Members

74. During her employment, Plaintiff was an hourly, non-union employee. Her standard schedule fluctuated depending on the department's needs, often working standard 9:00 AM to 5:00 PM shifts, or four days a week from 10:00 AM to 6:00 PM.

75. Despite her hourly, non-exempt status, Defendants implemented a common policy and practice of requiring Plaintiff, and other similarly situated non-exempt FLSA Collective Plaintiffs, to perform off-the-clock work without proper overtime compensation.

76. Plaintiff, FLSA Collective Plaintiffs and Class Members regularly were required by Mount Sinai to work through their meal and rest breaks even though these were uncompensated.

77. For a significant period, Plaintiff was the sole nurse assigned to the department. As a result, her manager, Director of Radiology Alvarez, required her to forgo her contractual 30-minute meal break and two 15-minute rest breaks, thereby causing Plaintiff to routinely work through her allotted unpaid break periods.

78. Despite performing compensable work during breaks Plaintiff was not compensated for such work, including for overtime hours where applicable.

79. Alvarez was not only aware of this practice, but directed that Plaintiff perform work during breaks without compensation on a regular basis.

80. Plaintiff directly observed other non-exempt FLSA Collective Plaintiffs and Class Members similarly being required by management to work during breaks even though breaks were uncompensated.

81. Furthermore, due to chronically poor scheduling and the relentless demands of the Radiology Department, Plaintiff was quite often required to remain 30 to 45 minutes past the end of her scheduled shift just to ensure continuity of patient care and complete her assigned duties. Defendants' management, specifically Alvarez and Fowler, were not only fully aware of this practice but engaged in deliberate and systematic understaffing whereby staying late an operational necessity.

82. This exploitation was not limited to Plaintiff. During her tenure, Plaintiff directly observed other non-exempt FLSA Collective Plaintiffs and Class Members similarly staying well past their scheduled shifts to meet the department's scheduling demands.

83. To Plaintiff's knowledge, despite management directly observing, expecting, and relying upon this off-the-clock work, neither she nor any of FLSA Collective Plaintiffs and Class Members were ever compensated with their lawfully earned overtime pay for these additional hours.

84. In total, due to Defendants' common time-shaving practices, Plaintiff routinely worked 6-8 compensable hours weekly without lawfully earned overtime pay.

85. Management directly observed, permitted, and required Plaintiff, FLSA Collective Plaintiffs, and Class Members to perform this unpaid off-the-clock work.

86. This deprivation of wages was compounded by severe administrative incompetence within Human Resources, specifically by Defendant Brooks, the HR Manager.

87. For example, in 2021, payroll processing was delayed due to an easily avoidable error made by Brooks. Administration's completely unacceptable solution was to force employees (including Plaintiff and similarly situated colleagues) to wait to receive a corrected paycheck the following pay cycle, ignoring the fact that employees were dependent on being paid on time.

**Gender Discrimination: The "Boys Club" Culture and Disparate Treatment**

88. Concurrently with these wage abuses, Defendants cultivated a discriminatory, male-dominated "boys club" culture spearheaded by executives who heavily favored male employees over their female counterparts.

89. Defendants engaged in widespread, gender-based wage disparity by actively recruiting male friends and former colleagues from Good Samaritan Hospital, bringing them in

at significantly higher starting salaries than highly experienced female staff performing the exact same duties.

90. This favoritism was blatant and systemic. For example, Defendants hired Alan Morris ("Morris") as the department's sole male front desk receptionist and paid him substantially more than his female counterparts, a disparity Morris openly flaunted by leaving his paystubs in plain sight.

91. Similarly, Defendants operated a hidden promotion track exclusively for male employees. Open positions were never publicly posted or offered to female staff. Instead, management quietly appointed favored men to specialized roles and instantly awarded them substantial pay raises.

92. For instance, Gerard Joyas ("Joyas") was appointed to the specialized role of Breast Coordinator despite a complete lack of relevant experience. Unlike female employees who performed equivalent work on an hourly basis, Joyas was uniquely compensated with a highly lucrative salary. Female employees, including Plaintiff, were completely shut out of these advancement and earning opportunities.

93. Furthermore, favored male employees were granted near-total immunity from hospital rules and disciplinary policies. While female staff were heavily scrutinized, management permitted male employees to commit egregious infractions without consequence. Fowler, for example, was routinely permitted to sneak out through a warehouse backdoor hours before his shift ended to work a second job.

94. Another male MRI technician and personal friend of Alvarez and Fowler, Chris Evans ("Evans"), routinely abandoned his shift at 6:00 PM, only to return at 9:00 PM to fraudulently swipe out. Despite having actual knowledge of this blatant time theft, which was witnessed by the entire office, management explicitly refused to discipline him. In fact, when

Evans demonstrated chronic lateness, management accommodated him by permanently altering his scheduled shift time to 9:30 AM.

95. Defendants' accommodations for male employees stand in stark contrast to their treatment of Plaintiff. While male colleagues were routinely accommodated for chronic lateness and unrecorded absences, Plaintiff (a female employee) was not offered equivalent shift flexibility for her caregiving responsibilities.

96. Instead, she was subjected to severe discipline and ultimately terminated for an isolated timekeeping discrepancy, further illustrating Defendants' pattern of gender-based disparate treatment.

**FMLA Interference**

97. Around 2021, Plaintiff applied for and was granted intermittent leave under the Family and Medical Leave Act ("FMLA") to care for her ailing mother and her son, who has special needs including Down Syndrome, ADHD, and severe gastrointestinal issues. She was allotted up to 60 days of intermittent leave per year.

98. From the onset of her FMLA approval, Defendants' management—including Alvarez, Radiology Manager Fowler, and Human Resources Manager Brooks—displayed hostility and a profound lack of competence regarding the administration of legally mandated leave.

99. Defendants completely failed in their affirmative statutory duty to advise Plaintiff of her rights and how to properly designate her leave. Brooks routinely dismissed Plaintiff's FMLA-related inquiries regarding her son's care, expressly claiming she "didn't know" how to handle the interplay between FMLA and New York Paid Family Leave (PFL).

100. Plaintiff sought to minimize the burden to Defendants of her FMLA by coordinating with HR regarding FMLA scheduling. However, despite questioning and

second-guessing Plaintiff's legally-protected use of FMLA, HR refused to coordinate with Plaintiff in this regard. Instead, in a clear effort to create obstacles to Plaintiff's use of FMLA,and thereby disincentivize Plaintiff from availing of her rights thereunder, HR demanded that Plaintiff direct basic internal scheduling inquiries to a third-party benefits administrator, The Hartford.

101. This administrative incompetence was glaringly apparent when Plaintiff needed to submit a separate FMLA claim for her own surgery. Brooks explicitly misfiled Plaintiff's paperwork and blatantly implied she had no idea how to correct it. Because Brooks abdicated her job responsibilities, Plaintiff was forced to do the research and legwork on her own to fix the filings. Ultimately, Hartford administrators became so frustrated by Brooks's inadequacy that they bypassed Mount Sinai HR entirely and dealt directly with Plaintiff.

102. Crucially, Plaintiff was never instructed by HR or management on the full parameters of her FMLA leave, including the fact that her intermittent FMLA could be utilized for partial-day absences or instances of minor lateness directly related to her caregiving responsibilities. Plaintiff received no support in navigating her legally protected time off and felt pressured by administration regarding her use of the leave.

103. Defendants ultimately terminated Plaintiff for availing of her legal right to use FMLA. During the February 2026 termination meetings, Defendants cited "Excessive absenteeism/unscheduled absences or lateness" as a formal basis for her discharge. During these meetings, HR aggressively interrogated Plaintiff regarding specific dates she had been absent, forcing Plaintiff to clarify on the spot that the dates in question were legally protected FMLA leave days.

104. Furthermore, Defendants used Plaintiff's caregiving responsibilities as a pretextual trap. When Plaintiff explained that the isolated 25-minute lateness used to justify her

termination occurred because she was outside the building on the phone with her special needs son's doctor, HR Manager Brooks shockingly asked Plaintiff why she did not simply use her FMLA time for the incident.

105. This exchange demonstrated that Defendants possessed actual knowledge that the lateness triggering her termination was an FMLA-qualifying event. Yet, rather than retroactively designating the 25 minutes as protected leave, or recognizing their own failure to advise Plaintiff that she could use her FMLA in such a manner, Defendants capitalized on their own administrative failures to unlawfully terminate her. Th

**Protected Activity: The Snow Storm Policy Complaint**

106. On Friday, January 23, 2026, at 3:10 PM, Alvarez sent an email notification to staff stating that due to an impending snowstorm, all network sites would be closed on Monday, January 26, 2026. The email dictated that employees would be required to use their accrued Paid Time Off (PTO) to cover the mandatory closure.

107. This sudden directive caused immediate distress among the staff, with one employee crying because she was saving her accrued PTO for her upcoming wedding.

108. At 4:02 PM that same day, Plaintiff engaged in protected activity by sending a formal, written complaint in reply to Alvarez, Brooks, and a large group of network executives. Plaintiff explicitly protested the sudden and unfair enforcement of the PTO policy, noting that it directly contradicted the hospital's historical practice of paying staff during emergency weather closures without forcing the forfeiture of accrued leave.

109. When Alvarez failed to respond promptly to her concerns, Plaintiff escalated her protected activity by calling the Mount Sinai Corporate Compliance Hotline to formally report the wage and hour policy violation.

110. While Plaintiff was on the phone with the compliance hotline, Fowler aggressively approached her workspace to surveil her, questioning who she was speaking to. This overt intimidation caused the compliance agent to ask Plaintiff, "do you want to call me back?" to which Plaintiff, feeling unsafe, replied yes.

111. Upon her return to the office, Plaintiff attempted to discuss the unfairly executed policy with Alvarez. Alvarez immediately confirmed his knowledge of her protected complaint, chillingly stating: “I know you called compliance because I have my own compliance officer—he is called Ray [Fowler] and he told me.”

**Immediate Retaliation and Unlawful Termination**

112. Almost immediately following her written complaint and her call to the compliance hotline, Defendants subjected Plaintiff to a campaign of targeted retaliation, micro-management, and hyper-surveillance.

113. Alvarez began appearing at Plaintiff’s desk far more frequently to scrutinize her work, a behavior he had never previously exhibited. Fowler routinely threw garbage out near Plaintiff's desk solely to surveil her, baselessly accusing her of operating a "side hustle" if she looked at her children's school emails or personal mail.

114. This retaliatory environment was fostered by a management culture that routinely bypassed corporate compliance and anti-retaliation training. Throughout his tenure, Alvarez regularly failed to personally complete his mandatory compliance modules. Instead, management permitted a subordinate female employee to log into the Mount Sinai system using Alvarez's credentials to complete his annual competency requirements on his behalf. Notably, these falsified records included mandatory workshops specifically covering "bullying awareness," discrimination, and retaliation. By evading the training designed to prevent

workplace harassment, Alvarez demonstrated a disregard for the very policies he subsequently violated in his campaign against Plaintiff.

115. Desperate to find a pretext to terminate Plaintiff, Defendants scrutinized her timekeeping records. On Monday, February 9, 2026, Alvarez and Brooks ambushed Plaintiff in a meeting, interrogating her about a timecard discrepancy. Specifically, at the start of the day, Plaintiff had clocked in at 9:04 AM but was observed to have commenced performing her duties at 9:29AM

116. Plaintiff honestly explained that she was outside the building at 9:00 AM on the phone with her special needs son's doctor and that a co-worker had swiped her in at her behest. Plaintiff believed this to be consistent with Defendants' policies given that she was at the worksite and on-call to perform her duties if required, and because male employees who left work for significantly longer periods while clocked never faced discipline despite management's awareness. Plaintiff apologized and truthfully noted this was a one-off error.

117. Other employees found by management to be engaging personal activities while clocked in on shift faced no consequences, or at most a verbal warning. Even employees caught sleeping in recovery room bays while on shift or other serious misconduct faced nothing more serious than a verbal warning.

118. Notably, entering through alternative warehouse doors or swiping in prior to parking was a standard, widespread practice among employees that management knew of and turned a blind eye to. Yet only Plaintiff was retroactively investigated and targeted for it.

119. Singling Plaintiff out for punitive enforcement because of retaliatory animus arising from her recent protected complaints, Defendants retroactively audited security cameras to find three other dates where Plaintiff allegedly entered the building minutes after being swiped in.

120. Plaintiff expressed to HR that she felt that the termination was retaliatory; Ms. Brooks dismissed this out of hand on the dubious ground that Defendants maintained a "very strong retaliation policy." HR's knee-jerk insistence that, because of the anti-retaliation policy, the notion that any retaliation could have occurred at Mt. Sinai was inconceivable and too outlandish for HR to entertain was an implicit threat to discourage Plaintiff from further pursuing any retaliation claims.

121. On Friday, February 13, 2026, exactly three weeks after she submitted her written complaint and called the compliance hotline, Defendants officially terminated Plaintiff's employment.

122. During the termination process,

123. The remarkable temporal proximity of exactly three weeks between Plaintiff's protected complaints regarding the snow policy and her termination, coupled with Alvarez's explicit admission of his knowledge of the call, the sudden hyper-surveillance, and the disparate disciplinary treatment, demonstrates a clear, retaliatory pretext for her discharge.

124. Furthermore, as a final example of Brooks's bad HR management and retaliatory animus, Brooks failed to address Plaintiff's COBRA medical benefits upon termination and completely failed to provide Plaintiff with legally mandated information regarding COBRA.

125. Plaintiff retained TA Legal Group PLLC as counsel to represent Plaintiffs and FLSA Collective Plaintiffs in this litigation and agreed to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### COUNT I – VIOLATIONS OF THE FAIR LABOR STANDARDS ACT Unpaid Overtime, Off-The-Clock Work, and Wage Notice Violations On Behalf of Plaintiff and FLSA Collective Plaintiffs Against All Defendants

126. Plaintiff realleges and incorporates by reference all preceding paragraphs.

127. Throughout her employment, Plaintiff was an hourly, non-exempt employee entitled to overtime protections under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., a In violation of these protections, Defendants enforced a systematic practice requiring Plaintiff and similarly situated employees to perform substantial off-the-clock work without lawful compensation.

128. Due to chronic understaffing and poor scheduling, Plaintiff frequently functioned as the sole nurse in the Radiology Department. Consequently, Director of Radiology Alvarez explicitly authorized Plaintiff to work through her thirty-minute meal and fifteen-minute rest periods without clocking out. Furthermore, the department's operational demands routinely required Plaintiff to remain 30 to 45 minutes past her scheduled shift.

129. The FLSA mandates compensation for all work an employer "suffers or permits." Employers are strictly liable for unpaid overtime when they possess actual or constructive knowledge that employees are working beyond their scheduled hours, even if such work is not formally reported or authorized. *See Perry v. City of New York*, 78 F.4th 502 (2d Cir. 2023); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008) (holding that employers cannot passively accept uncompensated work and avoid liability).

130. Here, Defendants, primarily through Alvarez and Radiology Manager Fowler, had actual knowledge that Plaintiff and the FLSA Collective Plaintiffs were routinely working through breaks and past their shifts. Rather than exercise reasonable diligence to prevent this practice or ensure proper compensation, Defendants knowingly accepted the benefit of this labor in direct violation of the FLSA.

131. Defendants' failure to pay overtime wages and provide accurate wage statements was neither accidental nor a clerical error; rather, it was deliberate and willful. Alvarez and

Fowler exercised complete control over departmental scheduling and payroll, consciously relying on uncompensated labor to maintain operations. This willful exploitation was department-wide. Plaintiff directly observed other FLSA Collective Plaintiffs performing identical off-the-clock work to cover staffing shortages. To Plaintiff's knowledge, Defendants systematically refused to compensate any of these employees, knowingly perpetuating a scheme to deprive hourly staff of their rightfully earned overtime.

132. Accordingly, Plaintiff and the FLSA Collective Plaintiffs have suffered significant financial harm. Plaintiff is entitled to recover her unpaid overtime wages, an equal amount in liquidated damages, statutory penalties for the wage notice and wage statement violations, pre-judgment interest, and reasonable attorneys' fees and costs pursuant to the FLSA and NYLL.

**COUNT II – CLASS-WIDE VIOLATIONS OF THE NEW YORK LABOR LAW**
**Unpaid Wages, Unpaid Overtime, Wage Notice Violations, and Wage Statement Violations on Behalf of Plaintiff and Class Members Against All Defendants**

133. Plaintiff realleges and incorporates by reference all preceding paragraphs.

134. Plaintiff brings claims under the NYLL pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and Class Members employed at Defendants' Nassau County and Suffolk County Facilities.

135. At all relevant times, Plaintiff and Class Members were employees within the meaning of the NYLL and were compensated on an hourly basis preventing application of all exemptions that apply to salaried employees only.

136. Plaintiff and Class Members were hourly, non-exempt employees and were not subject to any exemption from overtime compensation.

137. New York wage law requires overtime compensation for non-exempt employees for hours worked in excess of forty hours in a workweek. N.Y. Comp. Codes R. & Regs. tit. 12 § 146-1.4.

138. Defendants violated the NYLL by failing to pay Plaintiff and Class Members all wages and overtime compensation owed for compensable work performed through unpaid meal breaks and after scheduled shifts.

139. Defendants' NYLL violations arose from common policies and practices applicable to hourly, non-exempt employees across the covered Nassau County and Suffolk County locations, including centralized timekeeping, payroll, scheduling, break, overtime, wage-statement, and wage-notice practices.

140. New York Labor Law § 195 requires employers to provide specified wage notices at hiring, wage statements with each payment of wages, and payroll records reflecting hours worked, rates of pay, gross wages, deductions, allowances, and net wages.

141. Defendants failed to provide Plaintiff and Class Members with accurate wage notices at the time of hiring and willfully failed to provide accurate, itemized wage statements with each payment of wages. Because Defendants permitted Plaintiff to bypass timekeeping procedures during meal breaks and failed to maintain accurate, legally compliant payroll records, Plaintiff's damages may be established by her own reasonable estimates. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (holding an employee may prove uncompensated work "as a matter of just and reasonable inference" derived from their own recollection when employer records are deficient).

142. Defendants' wage notices, wage statements, and payroll records failed to accurately reflect all compensable time worked by Plaintiff and Class Members, including unpaid break time and post-shift work.

143. In addition to the aforementioned classwide claims, Defendants also violated Plaintiff's rights under New York Labor Law § 195(6) by failing to provide her a proper written termination notice.

144. Plaintiff and Class Members are entitled to recover unpaid wages, unpaid overtime compensation, liquidated damages, statutory penalties, pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs, and all other relief available under the NYLL. Plaintiff is also individually entitled to statutory penalties for the violation of § 195(6) as to him.

**COUNT II – FMLA INTERFERENCE AND RETALIATION**
**Violations of the Family and Medical Leave Act On Behalf of Plaintiff Individually Against All Defendants**

145. Plaintiff realleges and incorporates by reference all preceding paragraphs.

146. At all relevant times, Plaintiff was an eligible employee under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq., and Defendants were covered employers within the meaning of the statute. Plaintiff was approved for intermittent FMLA leave of up to sixty (60) days per year to care for her ailing mother and her son, who has special needs, including Down Syndrome.

147. Defendants unlawfully interfered with Plaintiff's exercise of her FMLA rights. The FMLA and its implementing regulations impose affirmative obligations on employers to provide employees with clear and accurate notice of their rights and responsibilities, including how intermittent leave may be used and designated. *See* 29 C.F.R. § 825.300. An employer's failure to provide such notice, or actions that discourage or mislead an employee in the exercise of FMLA rights, constitute actionable interference. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006).

148. Here, Defendants, specifically through Human Resources Manager Brooks and supervisory personnel, deliberately failed to provide Plaintiff with the required guidance regarding the use of her intermittent leave. Brooks routinely dismissed Plaintiff's inquiries, claimed ignorance regarding the interaction between FMLA and Paid Family Leave, and improperly directed Plaintiff to a third-party insurance administrator for internal scheduling matters for harassment purposes. Crucially, Defendants failed to inform Plaintiff that she could utilize her intermittent FMLA leave for partial-day absences or minor lateness directly related to her caregiving responsibilities.

149. This unlawful interference extended beyond Plaintiff's caregiving leave. When Plaintiff required a separate FMLA leave for her own surgery, Brooks blatantly failed to advise her and explicitly misfiled Plaintiff's critical FMLA paperwork. Because Brooks abdicated her job responsibilities, Plaintiff was forced to do the research and legwork on her own to fix the filings. Brooks's incompetence was so severe and obstructive that administrators at the third-party agency, Hartford, became frustrated with Defendants' inadequacy and were forced to bypass HR entirely to deal directly with Plaintiff. These collective failures created confusion, discouraged the proper use of leave, and materially interfered with Plaintiff's ability to exercise her statutory rights.

150. Defendants are further subject to individual liability under the FMLA. The Second Circuit recognizes that individuals who exercise sufficient control over an employee's FMLA rights and employment qualify as "employers" under the statute. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415 (2d Cir. 2016). Here, Brooks, Alvarez, and Fowler collectively exercised control over Plaintiff's schedule, monitored and scrutinized her leave usage, failed to process her leave paperwork, and directly participated in the decision to terminate her employment, thereby subjecting them to individual liability.

151. Furthermore, Defendants unlawfully retaliated against Plaintiff for exercising her FMLA rights. To establish retaliation, Plaintiff need only demonstrate that her protected leave was a motivating or negative factor in Defendants' decision to terminate her employment. *See Woods v. START Treatment & Recovery Centers*, 864 F.3d 158 (2d Cir. 2017) (holding that employers are strictly prohibited from using the taking of FMLA leave as a negative factor in employment actions).

152. Here, rather than properly administering Plaintiff's approved leave, Defendants weaponized her absences and occasional lateness, circumstances directly tied to her caregiving responsibilities and FMLA eligibility. Defendants retroactively scrutinized Plaintiff's time and attendance records, utilizing security footage to terminate her employment under the pretext of "excessive absenteeism" and timekeeping discrepancies. The fact that Defendants explicitly questioned Plaintiff about her FMLA usage during the termination process demonstrates unequivocally that her protected activity was a motivating factor in her discharge.

153. As a direct result of Defendants' unlawful interference and retaliation, Plaintiff has suffered severe financial and emotional distress. She is entitled to recover lost wages, employment benefits, liquidated damages, equitable relief including reinstatement or front pay, and reasonable attorneys' fees.

**COUNT III – GENDER DISCRIMINATION AND DISPARATE TREATMENT**
**Violations of NYSHRL On Behalf of Plaintiff Individually Against All Defendants**

154. Plaintiff realleges and incorporates all the foregoing paragraphs.

155. Defendants discriminated against Plaintiff on the basis of her gender in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.

156. Following an administrative shift, Defendants cultivated a toxic "boys club" atmosphere within the Radiology Department. This culture was spearheaded by Alvarez and

Fowler, who aggressively recruited their male friends from Good Samaritan Hospital. These male hires were brought in at higher salaries than existing female staff and were immediately granted preferential treatment and unearned promotions, with Alvarez exclusively promoting males throughout his tenure until the weeks leading up to Plaintiff's termination.

157. This discriminatory culture manifested most egregiously in the disparate application of disciplinary policies. Favored male employees were permitted to blatantly falsify time records and abandon their posts without consequence. For instance, Fowler frequently left work hours early through a warehouse backdoor to work a second job. Evans, a male MRI technician, routinely left the building at 6:00 PM, only to return at 9:00 PM to fraudulently swipe out. When confronted with these blatant policy violations by male staff, management laughed it off and explicitly refused to discipline them.

158. The Second Circuit has consistently recognized that a male-dominated, "boys club" atmosphere that treats female employees as expendable or subjects them to harsher terms of employment constitutes actionable discrimination. *See Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013) (vacating summary judgment for the employer and recognizing that a "boys club" office culture, combined with disparate scrutiny of a female employee's work performance, violates the broad remedial purposes of New York civil rights laws).

159. Furthermore, terminating a female employee for an infraction that male employees commit with impunity is textbook disparate treatment. *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (holding that a plaintiff raises a strong inference of discrimination when they show they were subject to an adverse employment action while similarly situated employees outside their protected group were treated more favorably). While male employees were allowed to steal hours of time, Plaintiff was abruptly terminated for occasionally swiping

in minutes before physically parking her car—a minor practice that was universally utilized by the entire staff, including leadership.

160. By holding Plaintiff to a draconian disciplinary standard while granting male colleagues total immunity, Defendants violated state anti-discrimination laws. As a direct and proximate result, Plaintiff is entitled to an award of back pay, front pay, compensatory damages for severe emotional distress, punitive damages, and reasonable attorneys' fees and costs.

## COUNT IV – UNLAWFUL RETALIATION
## Violations of New York Labor Law § 215 On Behalf of Plaintiff Individually Against All Defendants

161. Plaintiff realleges and incorporates by reference all preceding paragraphs.

162. Defendants retaliated against Plaintiff for engaging in protected activities in violation of NYLL § 215, which prohibits an employer or its agents from discharging, penalizing, or in any other manner discriminating against an employee because the employee has made a complaint to the employer or to any other person that the employer has violated any provision of the Labor Law.

163. On January 23, 2026, Plaintiff engaged in protected activity under the NYLL by making formal, good-faith complaints to Human Resources, her department director, and the Mount Sinai Corporate Compliance Hotline. Plaintiff explicitly protested Defendants' sudden and unlawful execution of a snowstorm policy that forced employees to forfeit their accrued PTO, which constitutes earned wages and compensation under the NYLL, for a mandatory clinic closure. The Second Circuit has made clear that internal complaints regarding unlawful compensation practices qualify as protected activity under NYLL § 215. See *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015).

164. Defendants had actual, direct knowledge of Plaintiff's protected activity. On the very day she made the complaint, Fowler surveilled Plaintiff while she was speaking with the compliance hotline. Shortly thereafter, Alvarez explicitly confronted Plaintiff, stating: "I know you called compliance because I have my own compliance officer—he is called Ray [Fowler]."

165. Almost immediately following this protected complaint, Defendants initiated a campaign of targeted retaliation, hyper-surveillance, and micro-management. Alvarez began appearing at Plaintiff's desk to scrutinize her work, a behavior he had never previously exhibited. Fowler routinely threw garbage out near Plaintiff's desk solely to monitor her actions, baselessly accusing her of operating a "side hustle" if she looked at personal mail.

166. Desperate to manufacture a pretext for termination, Defendants retroactively audited security camera footage to scrutinize Plaintiff's timekeeping records. Defendants subsequently terminated Plaintiff for occasionally swiping into the building a few minutes prior to physically parking her car. This minor practice was universally utilized by the entire staff, including leadership, yet Plaintiff was singularly investigated and subjected to disproportionate discipline.

167. The Second Circuit has consistently held that a close temporal proximity between protected activity and an adverse employment action can support a causal inference of retaliation. See *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). In addition, retaliatory intent may be established through circumstantial evidence, including disparate treatment and increased scrutiny following protected activity. See *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).

168. Plaintiff was officially terminated on February 13, 2026, exactly three weeks after she called the compliance hotline. This close temporal proximity, coupled with Alvarez's explicit admission of his knowledge of the complaint, the sudden onset of hyper-surveillance,

and the disparate disciplinary action regarding a common timekeeping practice, demonstrates that Plaintiff's protected activity was a motivating factor in her termination.

169. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered significant economic and emotional harm. She is entitled to all available remedies under NYLL § 215, including reinstatement, back pay, front pay, liquidated damages of up to twenty thousand dollars, and reasonable attorneys' fees and costs.

**COUNT V – VIOLATION OF ERISA/COBRA**
**Failure to Provide Notice of Right to Elect COBRA Continuity Coverage On Behalf of Plaintiff Individually Against Corporate Defendants**

170. Plaintiff realleges and incorporates by reference all preceding paragraphs. At all relevant times, Plaintiff was a participant in a group health plan sponsored and maintained by Defendants. Upon information and belief, Defendants were designated as the "plan administrator" within the meaning of 29 U.S.C. § 1002(16)(A), or otherwise functioned as such, and were therefore responsible for providing required notices under ERISA and COBRA.

171. Under the Employee Retirement Income Security Act ("ERISA") and the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161(a), 1163, and 1166(a)(4), plan administrators are required to notify participants of their right to elect continuation of health insurance coverage upon the occurrence of a "qualifying event." Department of Labor regulations further require that such notice be furnished within forty-four (44) days of the qualifying event. *See* 29 C.F.R. § 2590.606-4(b)(2).

172. Plaintiff's termination on February 13, 2026, constituted a "qualifying event" within the meaning of 29 U.S.C. § 1163. Despite this, Defendants, specifically through Human Resources Manager Josephine Brooks, failed to provide Plaintiff with any COBRA election notice or any information regarding her right to continue her medical benefits. Defendants'

failure to furnish the required notice deprived Plaintiff of the opportunity to make an informed and timely election regarding continuation coverage.

173. Pursuant to 29 U.S.C. § 1132(c)(1), courts may, in their discretion, impose statutory penalties of up to $110 per day against a plan administrator who fails to comply with COBRA's notice requirements. The Second Circuit has recognized that such penalties are designed to induce compliance with ERISA's disclosure obligations and to punish administrators who fail to meet those obligations. *See Layaou v. Xerox Corp.*, 238 F.3d 205, 209 (2d Cir. 2001).

174. Courts within the Second Circuit routinely impose penalties where a plan administrator fails to provide timely COBRA notice, even in the absence of bad faith, particularly where the failure results in prejudice to the participant. *See, e.g., DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654–55 (2d Cir. 1994) (affirming imposition of penalties under § 1132(c) for failure to provide required ERISA disclosures and recognizing the statute's remedial purpose); *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (noting the broad remedial goals of ERISA and the importance of enforcing disclosure requirements); *see also Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 108 (2d Cir. 2005) (emphasizing the central role of disclosure in ERISA's statutory scheme).

175. District courts in this Circuit have specifically applied these principles in the COBRA context, recognizing that failure to provide a COBRA election notice warrants statutory penalties to deter noncompliance and protect plan participants. *See Gomez v. AMC Entm't, Inc.*, No. 18-CV-10444 (VSB), 2020 WL 4547291, at *6 (S.D.N.Y. Aug. 6, 2020) (awarding penalties and noting that such relief serves to compel compliance with ERISA's notice requirements); *see also Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, No. 05-CV-5680, 2009 WL 195616, at *4–5 (E.D.N.Y. Jan. 27, 2009) (recognizing availability of

penalties for failure to provide COBRA notice and emphasizing administrator's disclosure obligations).

176. Defendants' failure to provide the legally mandated COBRA notice deprived Plaintiff of critical information regarding her healthcare coverage and forced her to navigate post-termination medical needs without guidance, thereby causing significant prejudice.

177. Accordingly, Plaintiff is entitled to recover statutory penalties pursuant to 29 U.S.C. § 1132(c)(1) from the date the COBRA notice was due until the date such notice is provided, in an amount of up to $110 per day. *See Migliore v. Metro. Life Ins. Co.*, No. 04-CV-3135, 2006 WL 132049, at *9 (E.D.N.Y. Jan. 17, 2006) (recognizing the court's discretion to impose substantial penalties to deter noncompliance). Plaintiff further seeks an award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

WHEREFORE, on behalf of Plaintiff and as applicable, the FLSA Collective Plaintiffs and Class Members, Plaintiff respectfully requests that this Court grant the following relief::

- A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the FMLA, and the NYSHRL;

- An injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, permanently restraining them from engaging in the unlawful practices, policies, and patterns set forth herein;

- An award of unpaid overtime wages under the FLSA and NYLL;

- An award of liquidated damages equal to 100% of the unpaid wages under both the FLSA and the NYLL for the wage and hour violations;

- An award of statutory penalties under NYLL §§ 198(1-b) and 198(1-d) for Defendants' failure to provide compliant wage notices and wage statements;

- Certification of this action as a collective action under the FLSA, 29 U.S.C. § 216(b);

- Certification of this action as a class action as to NYLL claims pursuant to FRCP 23.

- Designation of Plaintiff as the representative of the FLSA Collective and her counsel as counsel for the collective;

- Designation of Plaintiff as the representative of the Rule 23 class and her counsel as Class Counsel;

- An award of liquidated damages under the FMLA for Defendants' unlawful interference and retaliation;

- An award of liquidated damages of up to twenty thousand dollars ($20,000) for Defendants' unlawful retaliation in violation of NYLL § 215;

- An award of statutory penalties against the corporate Defendants of up to $110 per day from the date the COBRA election notice was due until the date such notice is provided, pursuant to ERISA, 29 U.S.C. § 1132(c)(1);

- An award of equitable relief, including reinstatement or front pay, and compensatory damages, including lost wages, back pay, and employment benefits, for Defendants' unlawful FMLA interference and retaliation, NYLL § 215 retaliation, and NYSHRL discrimination;

- An award of compensatory damages for severe emotional distress, mental anguish, and humiliation under the NYSHRL;

- An award of punitive damages for Defendants' willful, malicious, and reckless conduct under the NYSHRL

- An award of pre-judgment and post-judgment interest;

- An award of reasonable attorneys' fees, costs, and expenses incurred in this action; and

- Such other and further legal or equitable relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: Huntington, NY
May 5, 2026

**TA LEGAL GROUP PLLC**
*Attorneys for Plaintiff O'Hara,*
*FLSA Collective Plaintiffs, and Class Members*

By: ______________________________

Taimur Alamgir, Esq.
Matthew J. Daidola, Esq.
205 East Main Street, Suite 3-4
Huntington, NY 11743
(914) 552-2669
(631) 942-7399
tim@talegalgroup.com
matthew@talegalgroup.com